UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 MAY -5 PM 3: 07
U.S. DISTRICT COURT
N.D. OF ALABAMA

RICKY NORRIS,                }
                             }
    Plaintiff,               }
                             }
v.                           }    CASE NO. CV 97-JEO-1473-S
                             }
MEDTRONIC INC., et al.       }
                             }
    Defendants.              }
                             }

ENTERED
MAY 0 5 1999

## MEMORANDUM OPINION

Before the court is the Motion for Summary Judgment filed by defendant Medtronic, Inc. ("Medtronic"). Upon consideration of the record, the submissions of the parties and the relevant law, the court is of the opinion that the defendant's motion is due to be denied in part and granted in part. Also before the court is the defendant's Motion to Withdraw Preemption Grounds as Basis for Summary Judgment, which is due to be granted.

## FACTUAL SUMMARY

The plaintiff injured his back in 1990 or 1991. (Pl. Depo. at 16). As a result, his doctors implanted in him a Medtronic SynchroMed® Implantable Drug Pump (the "drug pump" or "first drug pump") and an accompanying catheter (together, the "infusion system") on May 24, 1993. (Tutak Depo. at 13-14, 16-17; Mueller Aff. ¶ 6).[1] The catheter was

---

[1] Excerpts of the plaintiff's deposition and Dr. Tutak's deposition, as well as the Affidavits of Mueller and Zacharias, appear in the court's record as attachments to the plaintiff's Opposition to Motion for Summary Judgment Filed by Defendant, Medtronic, Inc., et al. (listed as Document 11 in the court's record) and as attachments to Medtronic's Motion



implanted through an incision in the plaintiff's back, and the drug pump was implanted through an incision in his abdomen. (*Id.* at 54). Through the catheter, the drug pump delivers a controlled amount of pain medication in the amount and at the times prescribed by a doctor. (Mueller Aff. at ¶ 7).

After the drug pump was implanted, the plaintiff's physician, Dr. Unal Tutak, discovered that the drug pump was not dispensing morphine as it should have been. (Pl. Depo. at 68-69; Tutak Depo. at 51-53). The drug pump was therefore removed from the plaintiff's body on August 9, 1993 and a second drug pump was implanted in one continuous procedure ("replacement pump"). (Tutak Depo. at 51-54, 57, 67, Ex. 1; Pl. Depo. at 68-70). This replacement pump was attached to the catheter that had already been implanted in the plaintiff on May 24, 1993. (Tutak Depo. at 57).

After examining the drug pump that had been removed from the plaintiff, Medtronic informed Dr. Tutak that it had determined that the "slit valves in side port were stuck shut." (Tutak Depo. at 26-27, Ex. 1). Dr. Tutak testified that he does not know what a slit valve is and cannot explain its function. (Tutak Depo. at 27).

Two months after the replacement pump was implanted into the plaintiff's body, he suffered a staphylococcus infection. (Tutak Depo. at 58-60). This infection occurred at the surgical incision on the plaintiff's back, which had been used to implant the catheter into his body on May 24, 1993. (Tutak Depo. at 57-59; Pl. Depo. at 76-79). Although Dr. Tutak stated that it is possible that the plaintiff was infected during the implantation of the

---

for Summary Judgment (listed as Document 7 in the court's record).

replacement pump, he also stated that a staphylococcus infection can be caused by many things and that it would be impossible to determine the exact cause of the plaintiff's staphylococcus infection. (*Id.* at 60, 69, 72). In January, 1994, the plaintiff underwent surgery to remove the catheter and treat his infection. (Tutak Depo. at 58-59).

The plaintiff filed this action on May 9, 1997 in the Circuit Court of Jefferson County, alleging that Medtronic breached express and implied warranties with respect to the drug pump implanted in him on May 24, 1993. Medtronic removed the case to this court and moved for summary judgment.

## SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); see *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex*, 477

U.S. at 322-23; see FED. R. CIV. P. 56(a) and (b).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. Id.

After a properly made motion has been properly responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11

4

(1983). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## DISCUSSION

### A. Breach of Implied Warranty

Medtronic initially argued that it is entitled to summary judgment on the plaintiff's breach of implied warranty of merchantability claim because that claim is expressly and impliedly preempted under the Supremacy Clause of the United States Constitution by the Medical Device Amendments, ("MDA"), 21 U.S.C. §§ 360c, *et seq.*, to the Federal Food,

5

Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, *et seq.*.[2]  On March 19, 1999,

Medtronic filed a Motion to Withdraw Preemption Grounds as Basis for Summary Judgment.

As a basis for this motion, Medtronic cited *Goodlin v. Medtronic*, 1999 WL 77205, *7-8

(11th Cir. Feb. 18, 1999).  The court has reviewed *Goodlin* and finds that Medtronic's motion

is due to be granted.

Medtronic next argues that it is entitled to summary judgment on the plaintiff's breach

of implied warranty of merchantability claim because the plaintiff has not presented evidence

that the first drug pump was defective when it left Medtronic's hands.[3]  The implied warranty

of merchantability is found in Ala. Code § 7-2-314(1) (1997): "[A] warranty that the goods

shall be merchantable is implied in a contract for their sale if the seller is a merchant with

respect to goods of that kind."  To be considered "merchantable," goods must be "fit for the

ordinary purposes for which such goods are used."  Ala. Code § 7-2-314(2)(c) (1997).

The defendant argues that the court must grant summary judgment on this claim

because the plaintiff has not shown that the drug pump was defective at the time of sale.  As

support, the defendant cites numerous cases from other jurisdictions.  Supplemental Brief in

Support of Medtronic's Motion for Summary Judgment at 1-2.  The court notes that, in each

---

[2]The Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, *et seq.*, as amended by the Medical Device Amendments, ("MDA"), 21 U.S.C. §§ 360c, *et seq.*, mandates that certain medical devices, such as the drug pump, receive premarket approval from the Federal Food and Drug Administration ("FDA") before they are marketed.  *(See also* Mueller Aff. at ¶ 5-11).

[3]Although it is not clearly stated in the pleadings which type of implied warranty was allegedly breached, the parties have focused their argument on the implied warranty of merchantability.

of these cases, it is clearly stated that a necessary element of proving a breach of implied warranty of merchantability claim is showing that the goods were defective or were not merchantable *at the time of sale*. *See Ruffin v. Shaw Industries, Inc.*, 149 F.3d 294, 301 (4th Cir. 1998) (applying North Carolina law); *Advantage Engineering, Inc. v. Burks Pumps, Inc.*, 1994 WL 317126, *6 (7th Cir. June 30, 1994) (applying Indiana law); *Omega Engineering, Inc. v. Eastman Kodak Co.*, 30 F. Supp. 2d 226, 248-49 (D. Conn. 1998); *Hood v. Ryobi North American, Inc.*, 17 F. Supp. 2d 448, 450 (D. Md. 1998); *Sover v. Eagle Products, Inc.*, 896 F. Supp. 1085, 1091 (D. Kan. 1995); *DiLenno v. Libbey Glass Div. Owens-Illinois, Inc.*, 668 F. Supp. 373, 376 (D. Del. 1987); *Cosman v. Ford Motor Co.*, 674 N.E.2d 61, 66 (Ill. App. 1 Dist. 1996); *Jeep Eagle Sales Corp. v. Mack Massey Motors, Inc.*, 814 S.W. 2d 167, 178 (Tex. Ct. App. 1991); *Delgado v. Inryco, Inc.*, 433 N.W. 2d 179, 183 (Neb. 1988); *Electric Terminal Corp. v. Cessna Aircraft*, 520 A.2d 144, 146 (R. I. 1987); *Leacer v. Wiles*, 429 S.W.2d 823, 832 (Tenn. App. 1968).

In Alabama, however, "[t]o establish [a] claim of breach of the implied warranty of merchantability, [the plaintiff] must '"prove the existence of the implied warranty, a breach of that warranty, and damages proximately resulting from that breach."'" *Tucker v. General Motors Corp.*, 1998 WL 178780, *6 (Ala. Civ. App. April 17, 1998) (quoting *Barrington Corp. v. Patrick Lumber Co.*, 447 So. 2d 785, 787 (Ala. Civ. App. 1984) (quoting *Storey v. Day Heating & Air Conditioning Co.*, 56 Ala. App. 81, 83, 319 So.2d 279, 280 (Ala. Civ. App. 1975)). There appears to be no requirement that the plaintiff prove there was a defect at the time of the sale. In addition, paragraph 13 of the Official Comment following Ala.

Code § 7-2-314 reads as follows:

> In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained. *In such an action an affirmative showing by the seller that the loss resulted from some action or event following his own delivery of the goods can operate as a defense.* Equally, evidence indicating that the seller exercised care in the manufacture, processing or selection of the goods is relevant to the issue of whether the warranty was in fact broken. Action by the buyer following an examination of the goods which ought to have indicated the defect complained of can be shown as matter bearing on whether the breach itself was the cause of the injury.

Ala. Code (1997) § 7-2-314, Official Comment at ¶ 13 (emphasis supplied).[4]

It thus appears that Medtronic cannot prevail on its motion for summary judgment by merely hypothesizing that the defect in the drug pump may have developed after it left Medtronic's hands, or by pointing to an absence of evidence disproving all possible all other potential causes for the defect. Instead, Medtronic has the burden in this instance to come forward with evidence that the plaintiff's injuries were the result of something that happened to the drug pump after it left Medtronic's hands.[5] Although Medtronic has speculated that this was the case, there is no such evidence before the court. The evidence before the court does not illuminate when the first drug pump left Medtronic's hands or what happened to it

---

[4]The court notes that, "[t]hough the official comments are a valuable aid in construction, they have not been enacted by the legislature and are not necessarily representative of legislative intent." *Simmons v. Clemco Industries*, 368 So. 2d 509, 514 (Ala.1979). Here, they aid the court in interpreting the plaintiff's burden in stating a claim for breach of the implied warranty of merchantability.

[5]The court's conclusion in this regard is consistent with Medtronic's answer, in which it lists as an affirmative defense that "the injuries and damages complained of by the plaintiff were the result of intervening and superseding causes, including actions of the plaintiff unrelated to Medtronic." (Answer at 2).

8

from then until the time of implantation. The evidence shows that the plaintiff never got any pain relief from the first drug pump after it was implanted in him, that Dr. Tutak removed that pump from the plaintiff just a few months after implantation and that he sent the pump to Medtronic for analysis. (Pl. Depo. at 64-65; Tutak Depo. at 16-17, 26-27). Medtronic examined the first drug pump and found that it had malfunctioned because the slit valves in the side port were stuck shut. (Tutak Depo. at 26-27). Such evidence is sufficient to overcome Medtronic's motion for summary judgment with respect to the plaintiff's claim for breach of implied warranty.

**B.     Breach of Express Warranty**

The defendant argues that it is entitled to summary judgment on the plaintiff's breach of express warranty claim because there is no evidence that any breach of express warranty occurred.[6] The express warranty on the drug pump provides as follows:

> A.     This Limited Warranty provides this assurance to the patient who receives a Medtronic SynchroMed™ Programmable Pump, Model 8610H, 8611H, or 8615 (Pump):
>
> (1)     Should the Pump fail to function within normal tolerances due to a defect in materials or workmanship or battery cell depletion, within a period of two (2) years, commencing with the date of implant of the Pump, Medtronic will issue a credit equal to the Purchase Price, as defined in Subsection A(2), against the purchase of another Pump requested as its replacement, or, at Medtronic's option, provide a replacement Medtronic Pump at no charge.
>
> (2)     The credit issued hereunder shall be provided to the purchaser

---

[6]The court notes that plaintiff's counsel essentially conceded the breach of express warranty claim during the hearing on this motion. In the interest of caution, the court will address the claim, nevertheless.

> of the replacement Pump. As used herein, Purchase Price shall mean the lesser of the original or replacement Pump purchase price, as evidenced by the Medtronic invoice, or the Purchase Price of the current functionally comparable Medtronic Pump.

(Zacharias Affidavit at Ex.A).

Medtronic argues that there is no evidence indicating that any "defect in the materials or workmanship" occurred in the first drug pump, since the plaintiff has presented no expert testimony to this effect. It also argues that, even assuming the plaintiff has presented adequate evidence of a defect, his express warranty claim must still fail because the remedy granted by the express warranty (credit equal to the purchase price of the pump, or, at Medtronic's option, a replacement pump) was provided to the plaintiff.

Alabama courts have held that "[i]n order to establish a breach of an express warranty ... the plaintiff must show that 'the warranty failed of its essential purpose'; that either the [defendant] refused to repair or replace the malfunctioning component, or failed to do so 'within a reasonable time.'" *Lipham v. General Motors Corp.*, 665 So. 2d 190, 192 (Ala. 1995) (quoting *Ag-Chem Equipment Co. v. Limestone Farmers Co-op., Inc.*, 567 So. 2d 250 (Ala. 1990)). *See also Tucker v. General Motors Corp.*, 1998 WL 178780, (Ala. Civ. App., April 17, 1998). The plaintiff has presented no evidence that would allow him to make either of these showings to establish a breach of express warranty.

There appears to be no dispute that Medtronic replaced the drug pump. The evidence indicates that, in accordance with the limited warranty set forth above, Medtronic timely replaced the drug pump with a pump that worked properly and gave the plaintiff significant relief from his pain. (Plaintiff Depo. at 74-76; Tutak Depo. at 59). Moreover, as set forth

10

below, there is no evidence that the infection the plaintiff developed about two months after the replacement pump was implanted was caused by the replacement pump. The evidence indicates that Medtronic honored the express warranty. The plaintiff has not pointed to evidence indicating otherwise and the court has found none. As there is no genuine issue of material fact regarding the breach of express warranty claim, that claim must fail.

Plaintiff further claims that Medtronic committed spoilation of evidence when it dismantled the first drug pump in order to inspect it after its removal from the plaintiff. The evidence indicates that Dr. Tutak mailed the first drug pump back to Medtronic after it was removed from the plaintiff and after Medtronic had already provided the plaintiff with the replacement pump. (Tutak Depo. at 66-67). Medtronic then, according to its regular procedures, dismantled and analyzed the drug pump, and determined that the "[s]lit valves in side port were stuck shut," which determination it then conveyed to Dr. Tutak, along with the name and telephone number of Medtronic's technical consultant who could answer questions about the analysis. (Tutak Depo. at Ex. 1). Medtronic argues that the pump was examined four years before this action was filed, that the plaintiff never instructed it not to dismantle the pump, never made a discovery request to obtain the pump, and has never disclosed an expert who could examine the pump. Medtronic argues that it still possesses the pump and that, though dismantled, it is not destroyed.

It therefore appears that there is no evidence that the pump was destroyed or spoiled, insofar as it could serve as evidence supporting the plaintiff's claims. The plaintiff has not alleged any attempt on his part to obtain or analyze the drug pump. He has merely alleged that he sent it to Medtronic, which dismantled it, analyzed it, and sent the results of that

11

analysis to his doctor. On this basis alone, he asserts that the drug pump has been destroyed. This is not the sort of evidence which would permit the court to invoke principles addressing the destruction or spoilation of evidence.

C.    **Claims related to the plaintiff's infection**

The plaintiff claims that Medtronic caused the infection that the plaintiff developed two months after his replacement pump was implanted. Damages for such an injury would be consequential damages under § 7-2-715(2)(b) of the Code of Alabama (1997), which allows recovery for "[i]njury to person or property proximately resulting from any breach of warranty." Medtronic asks the court to find that the plaintiff is not entitled to damages related to his infection because there is no evidence showing a causal link between the replacement pump and the infection, as is necessary under § 7-2-715(2)(b).

As neither § 7-2-715 nor related provisions in Alabama's commercial code define "proximately resulting," the court will turn to state law definitions of proximate cause. *See Wisniewski v. Great Atlantic and Pacific Tea Co.*, 323 A.2d 744, 747-48 (Pa. Super. Ct. 1974). Alabama case law defines proximate cause as "an act or omission that in a natural and continuous sequence, unbroken by any new and independent causes, produces an injury or harm and without which the injury or harm would not occur." *Dillard v. Pittway Corp.*, 719 So. 2d 188, 192 (Ala. 1998) (quoting *Thetford v. City of Clanton*, 605 So. 2d 835 (Ala. 1992)).[7]

The evidence reveals no indication that the complained-of act or omission (the alleged

---

[7]The court again notes that, in its answer, Medtronic treats "intervening and superseding causes" as an affirmative defense.

breach of implied warranties) produced the plaintiff's infection or that, without such an act or omission, the infection would not have occurred. The evidence shows that the infection occurred at the catheter implantation site, rather than the pump implantation site. The former is located on the plaintiff's back, the latter on his abdomen. (Tutak Depo. at 54, 57). The plaintiff's doctor testified that, although the implantation of the replacement pump could possibly have caused the plaintiff's infection, that such infections are caused by many things and that the cause of the plaintiff's infection here at issue is impossible to determine. Such speculative evidence is not sufficient to overcome Medtronic's motion for summary judgment on the issue of causation. *See McDonald v. Servpro*, 581 So.2d 859, 861 (Ala. Civ. App. 1991) (summary judgment proper where experts did not opine that chemical was the proximate cause of plaintiff reaction, but merely speculated that the chemicals "could" have caused such reaction).[8]

Thus, it appears that there is no genuine issue of material fact as to whether Medtronic's alleged breach of implied warranty proximately caused the plaintiff's infection. Summary judgment is thus due to be granted with respect to any claims that the replacement pump caused the plaintiff's infection.

## CONCLUSION

The plaintiff's evidence does not raise any genuine issue of material fact regarding his breach of express warranty claim and any claim for damages related to the infection allegedly

---

[8] A petition for writ of certiorari as to this decision was denied on June 21, 1991 by the Alabama Supreme Court without an opinion or table reference. *See Servpro*, 581 So.2d at 859 (notation below caption of case).

13

caused by Medtronic's conduct. Accordingly, the motion for summary judgment is due to be granted as to those claims. For the reasons set forth above, Medtronic's motion for summary judgment is due to be denied as to the plaintiff's breach of implied warranty claim. In addition, as is set forth above, Medtronic's Motion to Withdraw Preemption Grounds as Basis for Summary Judgment is due to be granted. An order consistent with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 4th day of May, 1999.

JOHN E. OTT
United States Magistrate Judge